**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Heather Cooper, | No. CV-18-00116-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Dignity Health, doing business as St. Joseph's Hospital and Medical Center, | |
| Defendant. | |

Plaintiff Heather Cooper asserts Americans with Disabilities Act ("ADA") claims against Defendant Dignity Health. Doc. 1-1 at 4-21. Defendant moves for summary judgment on all claims, and Plaintiff cross moves for partial summary judgment on certain requests for an accommodation. Docs. 111, 118. The motions are fully briefed. Docs. 130, 131, 134. Plaintiff's request for oral argument is denied because it will not aid in the Court's decision. *See* Fed. R. Civ. P. 78(b); LRCiv 7.2(f). For reasons stated below, the Court will grant Defendant's motion and deny Plaintiff's cross-motion.[1]

## I.    Background.

The following facts are not genuinely disputed for purposes of summary judgment. Defendant owns and operates St. Joseph's Hospital and Medical Center. Plaintiff worked

---

[1] The Court apologizes to the parties for the delay in ruling on these motions. An unexpectedly large number of trials and motions, and one very large case (40 motions in limine and 9 *Daubert* motions), delayed the Court's attention to this matter.

at St. Joseph's as an intraoperative neuromonitoring technologist ("IONM tech") from 2010 to late 2013. Doc. 1-1 at 5, 15.[2] IONM techs monitor nerve functioning of patients undergoing brain and spinal surgery. Docs. 112, 119 ¶¶ 1-3. Mornings were a particularly busy time for IONM techs because surgeries typically started at 7:30 a.m. *Id.* ¶¶ 8-9. The techs were expected to complete a set of pre-op tasks when they arrived in the morning, including changing into scrubs, getting the appropriate equipment, going to the operating room, and starting up their computers. *Id.* ¶ 8. Plaintiff's scheduled arrival time was 7:00 a.m. Doc. 1-1 at 5.

Defendant's Attendance and Punctuality Policy governed Plaintiff's employment. Docs. 112, 119 ¶ 13. The Policy required an employee to arrive at work on time and notify a manager of any absence or tardiness at least two hours before the shift. *Id.* ¶ 14. There was no acceptable amount of tardiness under the Policy, and four unscheduled tardies could subject the employee to corrective action, including termination. *Id.* ¶ 15.

In October 2011, Plaintiff received a corrective action for clocking in for work after 7:00 a.m. more than 70 times in the preceding four months. *Id.* ¶ 20. The corrective action explained that tardiness affects work for other IONM techs, pre-op tasks, and patient application. *Id.* It also notified Plaintiff of the expectation to be clocked in for work by 7:00 a.m. *Id.* Plaintiff received another corrective action in February 2012 because she had been tardy 40 times since the previous corrective action. *Id.* ¶ 22.

Plaintiff claims that she began experiencing panic attacks in August 2012 and was diagnosed with anxiety, depression, and panic, mood, and borderline personality disorders. Doc. 118 at 2. She took prescribed medications for these conditions during the remainder of her employment with Defendant. Docs. 112-1 at 74, 121-1 at 7. Plaintiff claims that the conditions and side-effects from the medications made it difficult for her to get ready for work in the morning. Doc. 118 at 6.

---

[2] Citations are to page numbers attached to the top of pages by the Court's electronic filing system.

Plaintiff clocked in for work after 7:00 a.m. fifteen times in January 2013. Docs. 112, 119 ¶ 24. She received a written warning for her excessive tardiness on February 8, 2013. *Id.* ¶ 25. Plaintiff was warned that "[i]f she arrives and punches in at work any time after 7:00 a.m. following the presentation of this correction action . . . this may lead to termination of employment." *Id.* ¶ 26.

Concerned that her job was in jeopardy, Plaintiff discussed her medical problems with her immediate supervisor, Alonso Araux, and the IONM department manager, Rhonda Coates. *Id.* ¶ 27. Plaintiff also provided two doctor's notes, one of which stated that Plaintiff had attended an appointment at an entity named JFCS, and the other stating that Plaintiff "is involved with both counseling and psychiatric services" through JFCS. Doc. 112-3 at 5, 7. Plaintiff was granted leave under the Federal Medical Leave Act ("FMLA") between mid-February and late May 2013. Docs. 112, 119 ¶¶ 29-30, 33-36. The leave was intermittent. As Plaintiff explains in her reply in support of her cross-motion for summary judgment, her leave was "intermittent FMLA leave up to four days per month"; she "was using her FMLA leave as needed when she was sick in the mornings and she was not on continuous leave the entire time – she still had to report to work when she did not call in to take days off using her FMLA time." Doc. 134 at 4.

While on leave, Plaintiff asked Defendant's third-party human resources administrator, Matrix HR Management ("Matrix"), if she could use FMLA leave to arrive at work between 9:00 and 10:00 a.m. Docs. 112, 119 ¶ 37; Doc. 112-3 at 13-14. Matrix explained that the FMLA does not cover a late start time and that Plaintiff needed to ask Defendant's human resources department for an ADA accommodation. *Id.* Plaintiff returned to work in late May 2013 after exhausting her FMLA leave. Docs. 112, 119 ¶ 36.

On May 31, 2013, Plaintiff met with Coates and human resources consultant Jennifer Musegades and requested to be relieved from on-call shifts on Wednesday evenings so she could attend therapy sessions. *Id.* ¶ 39. During the meeting Musegades granted Plaintiff paid time off even though Plaintiff did not have a full day accrued.

Doc. 121-1, ¶¶ 101-11.  Musegades also suggested that Plaintiff could receive unpaid time off and provided her paperwork to request such an ADA accommodation.  *Id.* ¶ 122. Plaintiff stated that she could not afford unpaid time off (*id.* ¶ 123) and did not complete the paperwork (Docs. 112, 119 ¶ 42).

A department-wide meeting took place on June 28, 2013, which Plaintiff attended. Docs. 112, 119 ¶ 44.  Plaintiff and other IONM techs were told that they were expected to be clocked in for work by 6:45 a.m. with a six-minute grace period.  *Id.* ¶ 45.

Plaintiff clocked in after 6:51 a.m. six times after the June 28 meeting, and received a written warning for tardiness on July 16.  *Id.* ¶ 48.  She received a final written warning for continued tardiness on August 7, and was again tardy on September 26 and October 2.  *Id.* ¶ 53.  She was placed on administrative leave on October 3.  *Id.* ¶ 60.

On October 7, Plaintiff emailed Musegades requesting a late start time accommodation and informing Musegades that she was filing an EEOC charge. Doc. 119 at 16, ¶ 38.  Plaintiff sent Musegades a letter two days later requesting a 7:15 a.m. start time.  Docs. 112, 119 ¶ 62.  Musegades replied the same day, explaining that one of the essential functions of an IONM tech is to be at work at 6:45 a.m. to prepare for surgeries and that her request for a late start time would disrupt the department's operations.  Doc. 112-5 at 2-3.  Musegades discussed the request with Plaintiff in meetings on October 10 and 21.  *Id.* ¶ 63.  Defendant found the request unreasonable given the duties of the IONM tech position, particularly the pre-op work required before a patient was brought into the operating room.  *Id.* ¶ 66; *see* Doc. 112-5 at 3.  During the October 21 meeting, Defendant terminated Plaintiff's employment. Docs. 112, 119 ¶ 67.

Plaintiff filed a charge of discrimination with the EEOC after her termination. Doc. 1-1 at 16, ¶ 124.  The EEOC found reasonable cause to believe that Defendant had violated the ADA.  *Id.* ¶ 125; *see* Doc. 122-1 at 91-92.  The EEOC issued a right to sue letter on September 18, 2017.  Doc. 1-1 at 16, ¶ 126.

Plaintiff filed suit three months later. Doc. 1-1 at 4-20. The complaint asserts several violations of the ADA: discrimination based on Plaintiff's termination and Defendant's failure to engage in an interactive process and provide a reasonable accommodation, unlawful discharge, hostile work environment, and retaliation. *Id.* at 16-19.

Defendant seeks summary judgment on each claim, arguing that: (1) the discrimination claim fails because Plaintiff could not perform an essential function of her job – namely, to arrive at work on time – and Plaintiff has no evidence that Defendant failed to engage in the interactive process or provide a reasonable accommodation; (2) the unlawful discharge claim is duplicative of the discrimination claim and fails for the same reasons; (3) the retaliation claim fails because no causal link exists between Plaintiff's protected activity and her termination; and (4) hostile work environment claims are not cognizable under the ADA, and Plaintiff impermissibly bases her claim on performance-based actions unconnected to her disability. Doc. 111 at 2, 7-17. Plaintiff seeks partial summary judgment on the discrimination claim with respect to the requests for a late start time accommodation made on May 7 and October 7, 2013. Doc. 118 at 4-6, 24-25.

## II.    Summary Judgment Standard.

Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The evidence must be viewed in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and all justifiable inferences are drawn in that party's favor because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions," *Anderson*, 477 U.S. at 255.

## III.    Discrimination.

The ADA provides that no employer "shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."    42 U.S.C.A. § 12112(a).    An employer engages in unlawful discrimination under the ADA by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]"  42 U.S.C. § 12112(b)(5)(A); *see Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a qualified individual[.]").    An employer has a duty to engage in an interactive process with a disabled individual to identify reasonable accommodations, *see Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 799 (9th Cir. 2017), and the failure to do so constitutes unlawful discrimination if a reasonable accommodation would have been possible, *see Snapp*, 889 F.3d at 1095.[3]

To establish an ADA discrimination claim, a plaintiff must show that (1) she is disabled; (2) she is a qualified individual, meaning she can perform the essential functions of her job; and (3) the defendant failed to provide a requested reasonable accommodation, failed to engage in an interactive process where a reasonable accommodation would have been possible, or terminated the plaintiff because of her disability.  *See id.*; *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1353 (9th Cir. 1996); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002).[4]

---

[3] "[T]here exists no stand-alone claim for failing to engage in the interactive process.    Rather, discrimination results from denying an available and reasonable accommodation."  *Snapp*, 889 F.3d at 1095.

[4] Defendant does not dispute that Plaintiff was a disabled person within the meaning of the ADA and had the "requisite skill, experience, [and] education" for the [IONM tech] position."  29 C.F.R. § 1630.2(m).

**A.  Failure to Provide a Late Start Time Accommodation.**

Plaintiff claims that Defendant discriminated against her because of her disability by failing to provide a late start time accommodation.  Doc. 1-1 at 7, 10, 12-13, 16-18. Defendant asserts that punctuality is an essential function of the IONM tech position that Plaintiff was not able to perform.  Doc. 111 at 7.  The Court agrees with Defendant.

The ADA defines "qualified individual" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds[.]"  42 U.S.C. § 12111(8); *see* 29 C.F.R. § 1630.2(m); *Kennedy*, 90 F.3d at 1481.  The term "essential functions" means the "fundamental job duties" and not the "marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  "[T]he ADA and implementing regulations direct fact finders to consider . . . 'the employer's judgment as to what functions of a job are essential[.]'" *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (quoting 42 U.S.C. § 12111(8)); *see* 29 C.F.R. § 1630.2(n)(3)(i).  Other factors to be considered include written job descriptions, the consequences of not requiring the employee to perform the function, and the work experience of incumbents in similar jobs.  *See Bates*, 511 F.3d at 991; 29 C.F.R. § 1630.2(n)(3)(ii)-(vii).  Defendant has the burden of production in establishing what job functions of the IONM position are essential, "as 'much of the information which determines those essential functions lies uniquely with [Defendant].'" *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (quoting *Bates*, 511 F.3d at 991).

Defendant notes that the IONM department is a "teamwork" environment, accessible 24 hours a day, in which IONM techs work onsite with other medical professionals and interact with patients.  Docs. 112, 119 ¶ 2; *see Samper*, 675 F.3d at 1237 (explaining that regular and reliable attendance is an essential function where the job requires the employee to work "as part of a team," in "face-to-face interaction with clients and other employees," or "with items and equipment that are on site") (citations omitted); *Hill v. City of Phoenix*, 162 F. Supp. 3d 918, 924 (D. Ariz. 2016) (same).  The

morning is a particularly busy and critical time for IONM techs because they have to complete various pre-op tasks before the 7:30 a.m. surgeries could begin. *Id.* ¶¶ 8-9. The proper completion of these tasks is important because patient safety is the department's paramount concern. *Id.* ¶ 2. Coates has explained that IONM techs are required to be punctual because the department never wants to be the reason a surgery is delayed or patient care is compromised. Doc. 112-1 at 111, 124, 160-61.

Defendant's written punctuality policy and disciplinary actions against Plaintiff for tardiness show that Defendant places a high priority on punctuality. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1366 (11th Cir. 2000) (the defendant "placed a high priority on punctuality [where its] policy handbook contained a detailed punctuality policy and [it] implemented a comprehensive system of warnings and reprimands for violations of the policy"); *Hartwell v. Spencer*, No. 5:16CV141-MW/MJF, 2018 WL 8807152, at *2 (N.D. Fla. Sept. 24, 2018) (the fire department "place[d] a very high priority on punctuality" given its detailed punctuality policy and disciplinary process for violations). Defendant's Attendance and Punctuality Policy make clear that IONM techs are expected to arrive for work on time in order to "provide continuity of patient care and efficient operations[.]" Docs. 112, 119 ¶ 13; *see* Doc. 112-2 at 32. Plaintiff's corrective actions explained that her excessive tardiness was "affecting work for other technologists, case set up, pre-op work, and patient application." Docs. 112, 119 ¶ 20; *see* Doc. 112-2 at 89, 92. The initial warning Plaintiff received makes clear that "[e]xcessive tardiness affects [Plaintiff's] work performance, morale of other staff employees, and patient care." Docs. 112, 119 ¶ 25; *see* Doc. 112-3 at 2.

The meeting on June 28, 2013 was held to clarify the department's policy on tardiness. Doc. 112-3 at 44. Each attendee, including Plaintiff, was specifically advised that "the expectation is that you are clocked in by 6:45 a.m. for your scheduled work shift." *Id.* The final warning Plaintiff received in July 2013 reiterated that the "[s]tart of the shift for IONM [techs] is 6:45 a.m." Docs. 112, 119 ¶ 49; *see* Doc. 112-4 at 2.

Araux testified that he had difficulty finding IONM techs in the morning and often did not have techs available at 7:00 a.m. when he needed to make schedule changes. Doc. 112-2 at 18-21. The transition to a 6:45 a.m. start was intended to ensure the techs could assemble in Araux's office by 7:00 a.m. *Id.* at 20. Coates testified that she changed the start time to 6:45 a.m. because "every morning [was] so overwhelming for the techs" and they "were having so much difficulty getting everything up and running in the morning." Doc. 112, 119 ¶ 46. Plaintiff's termination review document states that the 6:45 a.m. start time "was an operational need based on readiness of equipment and people prior to surgical start times." Doc. 112-4 at 19.

Plaintiff disputes none of this evidence. *See* Doc. 119 at 1-8.[5] Instead, Plaintiff asserts that Defendant's attempt to link her tardiness to patient safety is disingenuous because Plaintiff was always able to complete her pre-op tasks before patients were brought into the operating room. Doc. 118 at 11-13. But this says nothing about the effect of Plaintiff's tardiness on the morale of other IONM techs (*see* Docs. 112 ¶ 25) and the need for techs to be present at 7:00 a.m. to accommodate schedule changes and organize the department's work. And Plaintiff does not otherwise rebut Defendant's evidence showing that tardiness could compromise patient safety. *See Samper*, 675 F.3d at 1238 ("[T]he common-sense notion that on-site regular attendance is an essential job function could hardly be more illustrative than in the context of a neo-natal nurse"). An IONM tech's morning tasks included: (1) clocking in for work, (2) changing into sterile clothes, (3) checking an electronic screen with the day's schedule, (4) talking to Araux about any schedule changes or other issues, (5) going to the closet to get the cart with the tech's computer and equipment, (6) taking the cart into the operating room, and (7) making sure the computer and patient stimulators were working properly. Docs. 112-1 at 104-06, 112-2 at 19-20, 119 at 12. The parties dispute whether these tasks

---

[5] Plaintiff believes that the start time may have been changed due to her disability and accommodation requests, but admits that she has no specific knowledge as to why the change was actually made. Docs. 112, 119 ¶ 47; *see* Doc. 112-1 at 17.

typically take 15 or 30 minutes to complete (Docs. 111 at 9, 118 at 11), but Plaintiff acknowledges that there were "exceptions" to these tasks depending on a surgery's complexity. Docs. 118 at 12, 119 at 18. Defendant reasonably could conclude in its professional judgment that allowing Plaintiff to clock in for work only 15 minutes before brain and spinal surgeries – and rushing to complete her pre-op tasks – could compromise patient safety and the efficient and effective operation of the IONM department. Doc. 131 at 5; *see Samper*, 675 F.3d at 1238-39 ("The 24-hour hospital unit setting . . . affords a particularly compelling context in which to defer to rational staffing judgments by hospital employers based on the genuine necessities of the hospital business.") (citation omitted).

Plaintiff asserts that Araux was lax on when IONM techs needed to arrive in the morning (Doc. 118 at 10), but the disciplinary actions Plaintiff received clearly show that Coates – the IONM department manager – took tardiness seriously. Indeed, Coates held the department-wide meeting on June 28, 2013 to "reiterate [the] department policy on attendance and tardies." Doc. 112-3 at 44; *see also Nadler v. Harvey*, No. 06–12692, 2007 WL 2404705, at *7 (11th Cir. 2007) (an employer's past tolerance of tardiness does not negate evidence that punctuality is an essential function).

Plaintiff claims that the differential discipline she received after the June 28 meeting shows that punctuality was not an essential function. Doc. 118 at 10-11. Plaintiff notes that other IONM techs were late multiple times after the meeting and were not terminated, but admits that two of the techs received verbal warnings and the other tech received a write-up. *Id.*; *see* Docs. 119 at 17, 112-5 at 11. Defendant "was under no obligation to give [Plaintiff] a free pass" for her excessive tardiness even if other techs were not terminated for occasional tardiness. *Samper*, 675 F.3d at 1240. Moreover, regular punctuality could still be an essential job function even if Defendant did not enforce a strict no-tolerance policy. *See id.* (rejecting the argument that allowing a certain number of unplanned absences means that the employer could accommodate

unlimited absences because "this approach ignores recognition of employer needs and would gut reasonable attendance policies").

Regular punctuality may not be an essential function where the job "can be performed off site or deferred until a later day[,]" *Samper*, 675 F.3d at 1239, but Plaintiff's job required her to be at the hospital and prepared for neurosurgeries by 7:30 a.m. As in *Samper*, Plaintiff's "job unites the trinity of requirements that make regular on-site presence necessary for regular performance: teamwork, face-to-face interaction with patients . . ., and working with medical equipment." 675 F.3d at 1238. Thus, even construed in Plaintiff's favor, the undisputed facts show that punctuality was an essential function of the IONM tech position. As the Ninth Circuit noted in *Samper*, "a majority of circuits have endorsed the proposition that in those jobs where performance requires attendance at the job, irregular attendance compromises essential job functions." 675 F.3d 1237-38 (citing 13 cases from seven circuits); *see also Albright v. Trustees of Univ. of Pa.*, No. CV 19-00149, 2019 WL 5290541, at *6 (E.D. Pa. Oct. 18, 2019) (punctuality was an essential function because the plaintiff "works in the healthcare industry and . . . must arrive to work predictably and promptly in order to care for scheduled patients"); *Hartwell*, 2018 WL 8807152, at *3 ("In addition to the fire department's policy, the nature of Plaintiff's job provides further support for the conclusion that not only punctuality, but strict punctuality is an essential function of [the] job."); *Colonna v. UPMC Hamot*, No. 1:16-CV-0053 (BJR), 2017 WL 4235937, at *10 (W.D. Pa. Sept. 25, 2017) ("Punctuality is an essential function for an employee like Plaintiff, whose presence in the office is vital to process patients who are arriving in the morning."); *Barnhart v. Regions Hosp.*, No. CIV. 12-2089 DWF/FLN, 2014 WL 258578, at *8 (D. Minn. Jan. 23, 2014) ("attendance and punctuality were essential functions" of the plaintiff's position as a neurosurgery scheduling specialist and her "tardiness impacted her co-workers and the department"); *Johnson v. Children's Hosp. of Phila.*, No. CIV. A. 94–5698, 1995 WL 338497, at *2 (E.D. Pa. June 5, 1995) (the plaintiff could not perform

essential functions of his position as an aide in the radiology department where he frequently showed up late to work).

Plaintiff asserts that even if punctuality is an essential function, this does not end the inquiry because an employee is qualified under the ADA if she can perform the essential function with a reasonable accommodation. Doc. 118 at 13. But Plaintiff has not shown that her requested accommodation – a late start time – was reasonable. Plaintiff "essentially asks for a reasonable accommodation that exempts her from an essential function," an "approach [that] would eviscerate any attendance policy[.]" *Samper*, 675 F.3d at 1240. As many courts have recognized, "if punctuality is an essential function, then [Plaintiff's] request for exemption from the tardy policy is not, as a matter of law, a reasonable accommodation." *Beem v. Providence Health & Servs.*, No. 10-CV-0037-TOR, 2012 WL 1579492, at *4 (E.D. Wash. May 4, 2012) (citing *Samper*); *see also Cripe v. City of San Jose*, 261 F.3d 877, 884 (9th Cir. 2001) ("If a disabled person cannot perform a job's 'essential functions' . . . then the ADA's employment protections do not apply."); *Earl*, 207 F.3d at 1367 ("A request to arrive at work at any time, without reprimand, would in essence require [the defendant] to change the essential functions of [the] job, and thus is not a request for a reasonable accommodation."); *Barron v. Sch. Bd. of Hillsborough Cty.*, 3 F. Supp. 3d 1323, 1330 (M.D. Fla. 2014) (a request to arrive late "is not a reasonable accommodation because it would change the essential functions of a job that requires punctual attendance"); *Holmes v. Fulton Cty. Sch. Dist.*, No. 1:06-CV-2556-CC-AJB, 2007 WL 9650147, at *38 (N.D. Ga. Dec. 24, 2007) ("[T]he proposed accommodation of allowing Plaintiff to arrive late is not a reasonable accommodation because it would eliminate the essential function of punctuality").

In short, Plaintiff's discrimination claim fails because punctuality was an essential job function that she could not perform, and a late start time was not a reasonable accommodation. *See Samper*, 675 F.3d at 1241 (affirming summary judgment and noting that "[a]n employer need not provide accommodations that compromise performance

quality – to require a hospital to do so could, quite literally, be fatal"). The Court will grant summary judgment on this claim.

**B.    The Interactive Process and Plaintiff's Termination.**

"'Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations' that will enable the employee to perform her job duties." *Dunlap*, 878 F.3d at 799 (quoting *Humphrey*, 239 F.3d at 1137). Through this process, "the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Snapp*, 889 F.3d at 1095; *see Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111-16 (9th Cir. 2000) (the ADA requires employers to engage in an interactive process because it "is the key mechanism for facilitating the integration of disabled employees into the work place"), *vacated on other grounds by U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 406 (2002). An employer that fails to engage in the interactive process in good faith "will face liability 'if a reasonable accommodation would have been possible.'" *Snapp*, 889 F.3d at 1095 (quoting *Barnett*, 228 F.3d at 1116); *see* 29 C.F.R. § Pt. 1630, App. § 1630.9 (describing the interactive process and the importance of finding a reasonable accommodation if possible).

Plaintiff claims that Defendant failed to engage in an interactive process to determine whether Plaintiff's disability reasonably could be accommodated. Doc. 1-1 at 17. The Court does not agree.

When Plaintiff raised her health issues in January and February 2013 and provided two notes confirming that she was receiving counseling and mental health treatment, she was granted FMLA leave. The leave was intermittent, allowing Plaintiff to use her leave as needed when she was unable to work on particular days. Doc. 134 at 4.

Shortly after Plaintiff exhausted her FMLA leave, she met with Coates and Musegades and asked to be relieved from on-call shifts on Wednesday evenings so she

could attend therapy sessions. Docs. 112, 119 ¶ 39. She asserts that she also requested during this meeting that she be allowed to report to work up to 15 minutes late. Doc. 121-1, ¶ 115. During the meeting, Musegades granted Plaintiff additional paid time off even though she did not have a full day accrued. *Id*. ¶¶ 101-111. Plaintiff took the paid time off. Doc. 112-3 at 33. Musegades also suggested that Plaintiff could receive unpaid time off and provided her paperwork for an ADA accommodation. Doc. 121-1, ¶ 122. Plaintiff stated that she could not afford unpaid time off (*id*. ¶ 123) and did not complete the paperwork (Docs. 112, 119 ¶ 42).

The Court cannot conclude that Defendant failed to engage in the interactive process when it facilitated her FMLA leave, agreed that it could be intermittent and used only on days when she was ill, afforded her paid time off when the FMLA leave was exhausted, offered her additional unpaid time off, and provided her with an ADA form to complete so she could qualify for the unpaid time off. Plaintiff attempts to parse the events in this case and Defendant's responses during specific conversations, asserting that Defendant failed in various ways to engage in the interactive process during those events. But each event identified by Plaintiff concerned the same issue – Plaintiff's tardiness and the medical cause she identified. In response to this issue, it is undisputed that Defendant afforded Plaintiff intermittent FMLA leave, unearned paid time off, and unpaid time off.

Plaintiff argues that Defendant did not accommodate her condition by permitting her to arrive late, which is true, but the Court has already concluded that punctual attendance was an essential function of Plaintiff's job. As noted above, Defendant was not required to compromise this essential function. *Samper*, 675 F.3d at 1240 (Plaintiff "essentially asks for a reasonable accommodation that exempts her from an essential function"); *Cripe*, 261 F.3d at 884) ("If a disabled person cannot perform a job's 'essential functions' . . . then the ADA's employment protections do not apply."); *Earl*, 207 F.3d at 1367 ("A request to arrive at work at any time, without reprimand, would in essence require [the defendant] to change the essential functions of [the] job, and thus is not a request for a reasonable accommodation."); *Barron*, 3 F. Supp. 3d at 1330 (a

request to arrive late "is not a reasonable accommodation because it would change the essential functions of a job that requires punctual attendance"); *Beem*, 2012 WL 1579492, at *4 ("*Samper* clearly stands for the proposition that if punctuality is an essential function, then [Plaintiff's] request for exemption from the tardy policy is not, as a matter of law, a reasonable accommodation."); *Holmes*, 2007 WL 9650147, at *38 ("[T]he proposed accommodation of allowing Plaintiff to arrive late is not a reasonable accommodation because it would eliminate the essential function of punctuality").

The Court cannot conclude that Plaintiff's atomized focus on specific conversations is sufficient to show that Defendant discriminated against her by failing to engage in the interactive process. Defendant offered at least three meaningful accommodations – intermittent FMLA, unearned paid time off, and unpaid time off – and was unable to officially sanction her late arrivals without compromising an essential function of her job. The primary purpose of the "interactive process is to identify *reasonable* accommodations that will permit a disabled employee to remain with the company." *EEOC v. ValleyLife*, No. CV-15-00340-PHX-GMS, 2017 WL 227878, at *7 (D. Ariz. Jan. 19, 2017) (emphasis added). An employer does not fail to engage in that process by failing to offer an unreasonable accommodation. *See Moore v. Computer Assoc. Int'l, Inc.*, 653 F. Supp. 2d 955, 964 (D. Ariz. 2009) (the ADA does not guarantee an employee an accommodation of his or her choosing, only a reasonable one).[6]

### C. Plaintiff's Motion for Partial Summary Judgment.

Plaintiff seeks summary judgment with respect to the requests for accommodation she made to Matrix on May 7, 2013, and to Musegades on October 7, 2013. Doc. 118 at 4-6, 24-25. Plaintiff notes that after emailing Matrix about using FMLA leave to arrive at work between 9:00 and 10:00 a.m., no one discussed her limitations or potential

---

[6] The Ninth Circuit has held "that if an employer fails to engage in good faith in the interactive process, the burden at the summary-judgment phase shifts to the employer to prove the unavailability of a reasonable accommodation." *Snapp*, 889 F.3d at 1095. Because Plaintiff's evidence is insufficient for a reasonable jury to find that Defendant failed to engage in the interactive process in good faith, the burden does not shift and the Court need not address whether Defendant has met it.

accommodations. *Id.* at 24. But Defendant's Personal Leave Policy makes clear that Matrix cannot approve ADA requests absent approval from management and the human resources department (Doc. 122-1 at 78), and Matrix advised Plaintiff to seek a schedule change from her manager or the human resources department (Docs. 119 ¶ 37, 112-1 at 58).

With respect to the October 7 request, Plaintiff admits that Musegades asked her "questions about her disability, problems in the morning, and need for a slightly-late clock-in time[.]" Doc. 118 at 20; *see* Docs. 112, 119 ¶ 63. She asserts, however, that Musegades "did not go far enough" with the interactive process on that occasion. Doc. 118 at 20. As discussed above, the Court finds that Defendant's offered accommodations satisfied the interactive process and that Plaintiff cannot prevail by focusing on whether one employee's comments on a specific occasion went "far enough." The ADA is not a mandatory script for every conversation, deviation from which results in employer liability. As the Ninth Circuit has observed, "there exists no stand-alone claim for failing to engage in the interactive process. Rather, discrimination results from denying an available and reasonable accommodation." *Snapp*, 889 F.3d at 1095. Defendant offered Plaintiff at least three reasonable accommodations and did not violate the ADA by refusing to compromise an essential function of the job.

**IV.    Unlawful Discharge.**

Plaintiff does not dispute that her unlawful discharge claim (Doc. 1-1 at 18-19) is duplicative of her ADA discrimination claim (*see* Doc. 111 at 7 n.6). The Court accordingly will grant summary judgment on the unlawful discharge claim.

**V.    Retaliation.**

"To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004); *see* 42 U.S.C. § 12203(a). If the plaintiff makes a prima facie case of retaliation, "[t]he burden then shifts to the employer

to provide a legitimate, [nonretaliatory] reason for the adverse employment action." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). "If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual" *Id.*; *see Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472-73 (9th Cir. 2015) ("We apply the Title VII burden-shifting framework, as established in *McDonnell Douglas*[,] to retaliation claims under the ADA.") (citations omitted).

Plaintiff alleges that her requests for accommodation and notice of filing an EEOC charge constitute protected activity and Defendant took adverse actions by changing her start time, placing her on administrative leave, and terminating her employment. Doc. 118 at 21-22; *see* Doc. 1-1 at 18. Defendant argues that summary judgment is warranted because Plaintiff cannot show a causal link between the protected activity and any adverse action. Doc. 111 at 15-16. Plaintiff counters that the temporal proximity between the events is sufficient to preclude summary judgment. Doc. 118 at 15.

Causation may be inferred based on the temporal proximity between the protected activity and the alleged retaliation, *see Manatt v. Bank of America, NA*, 339 F.3d 792, 802 (9th Cir. 2003), but the connection in time must be "very close," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). This Circuit has "required temporal proximity of less than three months between the protected activity and the adverse employment action for the employee to establish causation based on timing alone." *Mahoe v. Operating Eng'rs Local Union No. 3*, No. CIV. 13-00186 HG-BMK, 2014 WL 6685812, at *8 (D. Haw. Nov. 25, 2014) (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)); *see Miller v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir. 1989) (two months sufficient); *Serlin v. Alexander Dawson Sch., LLC*, 656 F. App'x 853, 856 (9th Cir. 2016) (three months too long); *Brown v. Dep't of Public Safety*, 446 Fed. App'x. 70, 73 (9th Cir. 2011) (five months too long); *Pickens v. Astrue*, 252 F. App'x 795, 797 n.2 (9th Cir. 2007) (same); *Vasquez v. County of L.A.*, 349 F.3d 634, 646 (9th Cir. 2003)

(thirteen months too long); *see also Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (eight months too long).

Plaintiff alleges that when she received her first write-up for tardiness in January 2013, she informed Coates and Araux about her medical conditions and requested a reasonable accommodation to deal with her disability. Doc. 1-1 at 7. But Plaintiff was not placed on administrative leave and terminated until October. An inference of causation based on the timing of these events "is not possible . . . because approximately nine months lapsed between the date of [Plaintiff's accommodation request] and [Defendant's] alleged adverse [actions]." *Manatt*, 339 F.3d at 802.

Plaintiff was terminated less than two weeks after notifying Musegades that she was filing an EEOC charge (Doc. 119 at 16), but Defendant had started the process for terminating Plaintiff before she provided notice of the EEOC charge on October 7, 2013. The termination review document dated October 4, 2013 makes clear that the reason for the proposed termination was Plaintiff's repeated violations of the punctuality policy. Doc. 112-4 at 18. Because the termination process began before Plaintiff provided notice of the EEOC charge, the termination "cannot be said to have been in retaliation for [this] protected activit[y]." *Hargrow v. Fed. Express Corp.*, No. 03-0642-PHX-DGC, 2006 WL 269958, at *6 (D. Ariz. Feb. 2, 2006).

Because the start time change occurred more than five months after Plaintiff first requested an accommodation (Doc. 112 ¶¶ 44-45), the temporal proximity is not sufficient to create an inference of causation. *See Yartzoff*, 809 F.2d at 1376; *Serlin*, 656 F. App'x at 856; *Brown*, 446 Fed. App'x. at 73. Moreover, Plaintiff presents no evidence showing that Defendant's stated reason for the change – to allow IONM techs enough time to prepare for surgeries (Doc. 112 ¶ 46) – is mere pretext for retaliation.

Plaintiff asserts that retaliation need only be a "motivating factor" for the adverse action (Doc. 118 at 14), but this Circuit has rejected the motivating factor test in favor of a "but-for causation" standard for ADA retaliation claims. *Murray v. Mayo Clinic*, 934 F.3d 1101, 1107 (9th Cir. 2019); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570

U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m)."). "[T]he stronger 'but-for causation' standard serves to close the door on employees seeking to file . . . retaliation claims by disallowing an employee, who perceives his or her own impending termination, to 'shield against [those] imminent consequences' by pursuing some form of protected activity." *Shaninga v. St. Luke's Med. Ctr. LP*, No. CV-14-02475-PHX-GMS, 2016 WL 1408289, at *11 (D. Ariz. Apr. 11, 2016) (quoting *Drottz v. Park Electrochemical Corp.*, No. CV 11-1596-PHX-JAT, 2013 WL 6157858, at *15 (D. Ariz. Nov. 25, 2013)); *see also Brooks v. City of San Mateo*, 229 F.3d 917, 917 (9th Cir. 2000) (recognizing a concern that "employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a 'get out of jail free' card for employees engaged in job misconduct").

The Court will grant summary judgment on Plaintiff's retaliation claim.

## VI. Hostile Work Environment.

To establish a hostile work environment claim, Plaintiff must show that "(1) she is a qualified individual with disability; (2) she suffered from unwelcome harassment; (3) the harassment was based on her disability or a request for accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) Defendant[] knew or should have known of the harassment and failed to take prompt remedial action." *Vitchayananda v. Shulkin*, No. ED CV 17-0349 FMO (SPX), 2019 WL 4282905, at *10 (C.D. Cal. Mar. 29, 2019) (citations omitted). "When determining whether an environment was sufficiently hostile or abusive, courts examine all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with an employee's work performance." *Crowley v. Wal-Mart Stores*, No. CV 16-00293 SOM/RLP, 2018 WL 4345251, at *8 (D. Haw. Sept. 11, 2018) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998));

*see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (an abusive working environment exists when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment'") (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 165-67 (1986)); *Orio v. Dal Glob. Servs., LLC*, No. 14-00023, 2016 WL 5400197, at *16 (D. Guam Sept. 26, 2016) ("Like a hostile work environment claim based on sex, race, or nationality, a sufficiently severe or pervasive hostile work environment based on disability presents a high bar.").

Plaintiff presents the same evidence to support her hostile work environment claim that she relies on for her discrimination and retaliation claims – the discipline for excessive tardiness, the start time change, the denial of a reasonable accommodation, and her administrative leave and termination. Doc. 118 at 23. But those actions are not sufficiently harassing or abusive to support a hostile work environment claim under the ADA. Plaintiff cannot prevail when "the behavior on which [she] primarily relies consists of employment decisions with which she disagreed, not physical or verbal conduct of a harassing nature." *Keller-McIntyre v. S.F. State Univ.*, No. C-06-3209 MMC, 2007 WL 776126, at *13 (N.D. Cal. Mar. 12, 2007). Even construing the evidence in Plaintiff's favor, no jury reasonably could find that Plaintiff was subjected to "a discriminatorily hostile or abusive environment." *Meirhofer v. Smith's Food & Drug Ctrs., Inc.*, 415 Fed. App'x 806, 807 (9th Cir. 2011) (quoting *Harris*, 510 U.S. at 21); *see Mallard v. Battelle Energy All., LLC*, No. 4:12-CV-00587-BLW, 2013 WL 2458620, at *9 (D. Idaho June 6, 2013) (finding that the conduct the plaintiff endured over a five month period – forced unpaid leave, physical and psychiatric exams, the threat of termination, a requested return-to-work form, and a performance improvement plan – "falls far short of the severe, pervasive harassment needed to support a hostile work environment claim"); *Linder v. Potter*, No. CV-05-0062-FVS, 2009 WL 2595552, at *12 (E.D. Wash. Aug. 18, 2009) (plaintiff failed to show that his employer subjected him to a hostile work environment by "denying his request for continued sick leave, declaring him

AWOL after he properly requested additional sick leave, summoning him to an investigative interview[,] and denying his request for a reasonable accommodation"); *Wynes v. Kaiser Permanente Hosps.*, 936 F. Supp. 2d 1171, 1186 (E.D. Cal. 2013) (plaintiff's "dissatisfaction with how Kaiser accommodated her disability . . . does not give rise to a claim for hostile work environment harassment"). The Court will grant summary judgment on the hostile work environment claim.[7]

**IT IS ORDERED:**

1.    Defendant's motion for summary judgment (Doc. 111) is **granted**.

2.    Plaintiff's cross-motion (Doc. 118) is **denied**.

3.    The Clerk shall enter judgment in accordance with this order and terminate this case.

Dated this 7th day of February, 2020.

*David G. Campbell*

David G. Campbell
Senior United States District Judge

---

[7] Given this ruling, the Court need not decide whether the Ninth Circuit recognizes a hostile work environment claim under the ADA. *See* Doc. 111 at 17 (citing *Meirhofer*, 415 Fed. App'x at 807).